The State Board of Minors and the Commissioned Division of the Code Court is now in session. Honorable Justice Winfield signing. Please be seated. Thank you. Before we begin this morning, I'd like to state for the record that Justices Hudson and Justices Harris are unable to be with us today due to prior commitments, judicial commitments. They have had the full benefit of your written briefs and arguments contained therein, and they will have the full benefit of your oral arguments. They are fully participating members of this Court on each case this morning, which is one case, so don't take it personal. It's not your case. I think it's maybe because I didn't shower or something. My weapon of life is not there. But anyway, no, just seriously, they have prior judicial commitments, and they are fully participating members. So you have the three of us this morning to, in person, hear your oral arguments. So with that being stated for the record, will the Clerk please call the first case? 116-3203, Metropolitan Peer and Exposition Authority v. Ronald Young. Thank you. Counsel, you may proceed. May it please the Court. Counsel, Mark Matranda for the Metropolitan Peer and Exposition Authority. We are here before the Court to ask the Court's support in either one of two alternative forms of relief. One, we would ask the Court to reverse the commission, its finding that the petitioner is entitled to wage loss award under Section 18.1, and the alternative, that that does not please the Court, to have this matter remain in the commission for further proceedings on what this gentleman, Mr. Young, is capable of earning. Thank you. There's quite a bit of debate on whether or not Mr. Young could return to work as a painter, when I say painter, in the capacity that he worked for us, for the Peer, so-called union painter. I don't know that there's a separate category of painters, union versus non-union. I think they all do the same thing. But there's no question that the actual work he did at the Peer was different than a house painter, let's say. But painting is painting, and in that sense, he was a painter, and we are of the opinion that he could remain being a painter as we did at one time, Just before he returned to his physicians to obtain restrictions on no ladder climbing, we saw him using ladders painting a house. We submit Mr. Young can be a painter. When he tested on an FCE, he tested at the medium level, whereas the job of painter, the dictionary of titles, is at the medium level. He was able to climb ladders frequently. Something happened later, can't say what, but he returned to his doctors to obtain further restrictions regarding ladders. We're not so sure exactly where that came from, but at least as far as the FCE is concerned, the man is capable of being a painter. Meanwhile, he has considerable skills in machine setup, he's worked in construction, he's been a supervisor both as a painter and in other fields of endeavor. The vocational consultant, Mr. Mimick, identified a group of positions that paid anywhere from $16 to $21 per hour, which all fit with Mr. Young's capacities. His vocational consultant, quite frankly, was brought in just to certify the fact that he had a job, and that job was within his capacity. Yes, it was, but I don't think that's the measure of wage loss. This Court has pointed out several times recently that it's not what someone's earning, but what one is capable of earning. And in this case, Mr. Young is certainly capable of earning more than what he was making. He took a job immediately upon being placed at MMI or being released for treatment, and functionally speaking, practically speaking, that pretty much puts an end to any vocational rehabilitation because it's pretty hard to offer rehabilitation services when someone's working. Now, I'm not saying that Mr. Young turned down requests for vocational rehabilitation. I don't know that the record supports that. I'm speaking generally because I think the way the Commission administers the 81 wage loss system could use some improvement. Nonetheless, all the vocational consultant that the petitioner introduced was that this job was something he could do. She didn't do a transferable skills analysis. Basically, she was there just to certify that this is a suitable job. Did she opine that he lost his customary employment because he does not have the climbing cervical extension and overhead lifting capabilities required to pay him? Did she say that? I don't know if she used those exact words, but there were, I mean, generally speaking, that's my understanding of the factual context in which she was operating. I asked her if that was her opinion. I didn't ask you the factual context she was operating in. Well, yes. Okay. That's good. Yes. So if she said that and she has an opinion that says he cannot perform his usual customary work because he can't climb, he can't extend, and he can't do overhead lifting, so why doesn't the rest merely lie in the realm of weight, which is the Commission's obligation, not ours? Well, if we are dealing with the weight, I appreciate what you're saying, Your Honor. I think the weight would have to do with the fact that she didn't conduct a transferable skills analysis, which Mr. Wittig did, and I think the Commission should have taken note of that. Well, the Commission did. They found that the opinions of Steph, whatever her name is, was credible and persuasive, and Minnick was not persuasive. That's what they found. They didn't buy his opinion. Nonetheless, we maintain that he has learned of his transferable skills, and she admitted that some of the work he had done in the past was skilled, ergo he was capable of doing the types of work that Minnick outlined. Basically, what I'm saying here, Your Honor, is that I'm not on the Commission. Had I been on the Commission, I would have wanted to know more about what this man is capable of earning. This Court recently decided the Crittenden case is the case where the Court focused on what an individual is capable of earning. That was a case where the Commission awarded wage loss based on the maximum the claimant could make as a bus driver, but he did not have a driver's license. The Court stated that you can't award wage loss for something a person can't do. It has to be suitable employment. And I maintain and I submit to you that there's a difference between not unsuitable, which was the job he took, and suitable. Minnick outlined suitable jobs. Any type of job that someone could do would be not unsuitable. I think there's a distinction. There is a distinction. There's not a distinction without a difference. So, in other words, in your opinion, every time a defense expert, vocational rehabilitation expert, says he can do job A, B, C, D, E, and F, that in order to be entitled to a wage differential, he's got to attempt to get jobs A, B, C, D, and F, and be turned down before he's entitled to a wage differential. Is that your argument? In part, I agree, but what I'm saying, Your Honor, is that I think... I don't agree because I didn't say I believed it. I just asked if there was your argument. Well, I don't know if that's necessary, but what I'm saying is that I think the Commission should take it upon itself to investigate that type of thing further. If I had been on the Commission myself, I would have wanted to rename it back to the arbitrator for some more hearings. In other words... Well, his position... His position placed physical restrictions on him. Is that not correct? He had physical restrictions? Correct. Not a statement. All right. You didn't offer him a job. We did not. There was a layoff, so it was definitely not... And there's evidence in the record that he was informed by his union that no employers were willing to accommodate his work restrictions? I think that the union representative did state that as a general proposition that union payers generally did not work with... if they had restrictions such as he had. I believe that's what the union rep said. Didn't he testify that he continued to search for new employment opportunities even after he got his position in Midland Continental? Well, that leads me to my next and last point. And I think this is major in this case. The petitioner's testimony. I believe this testimony supports my idea that the Commission should have sent this back to the arbitrator. He said, at page 135-136 on the record, he went to work. He said, I needed to establish a work history. Again, since I've been out of work since 2010, so I needed to have some type of work history as far as when I do go get out there and find another employment. Plus, with this company, it provided me with learning a different skill as far as being able to operate their equipment and stuff like that. It's a very good company, but unfortunately, it doesn't offer any benefits and no chance of advancement. So I'm still at the end of trying to find something competitive, at least to keep up with the cost of living. So the petitioner is going to continue to, by his own words, continue to look for better work, which is admirable, by the way. But just as we have the concept, you know, no TTV after MMI until MMI and then TTV, it seems to me that with his job prospects, that that was not a fixed entity, a fixed object at the time he testified. Can I summarize it in terms of the law? What you're trying to say is it has to be suitable employment for the base for a wage differential. Is that right? Yes. Okay. So you're saying that his testimony, a reasonable inference is that he agrees that what he's doing now is not suitable. Is that what you're saying? And therefore, it would be an error to use his wage that he's earning now as the base for the differential. That would be a summary, a short summary. Is that what you're saying? There may be many suitable jobs, but he has himself admitted that there were more suitable jobs for him. Oh, okay. So we've got to define suitable, don't we? It's tough. Okay, because you just said more suitable. So now, I mean, I think you said. You know, I wouldn't want to be hung up on that. What I want to be hung up on is the fact that he himself stated that he was going to be looking for more suitable. Didn't he state that he was learning things at Midland that would enable him to get better work in the future? One could infer that from that statement. Yeah. So based on that, because you've got a man who can't go back to his usual occupation, cannot earn what he would have earned as a union payer, a man takes a job that he can perform, with a view toward learning additional skills to allow him to get a better job in the future, your argument is that that man is not entitled to a wage difference. No, no. No, you're right. Our argument is two-pronged here. One, we feel this case is closer to the Durfee case. It's not Durfee, Durfee. In Durfee, he turned down a job. But the thing is he was qualified for more. So, no, we have a two-part argument. If the court were not to accept the argument that he's not entitled to wage loss, what we would like to see is further hearings to see what he is capable of earning, because he himself admits he's capable of earning more and doing better. What does he admit that he's capable of earning more? He said he's working at Midland to gain skills that in the future might allow him to earn more money than he's making at Midland. Why does that mean that he's capable of earning more now? Well, I take that from what he said, that he himself knows he can do better. If he learns a new skill. Well, he already has other skills that he can use. I mean, that's in the record. We know he has prior experience. Is there any evidence in the record that he was offered a job in any of these areas where he has these skills? The only thing you've got is your expert's testimony, and the commission said we don't buy him. I agree with you there. I do not believe we offered him another form of employment. Your last issue is you say that they erred as a matter of law in the manner in which they calculated the wage differential, but nowhere do you say how it should have been calculated. I'm not prepared to argue that particular point at this time. Okay. That's a good position. Your Honor, the way I conceived this case when I looked at this, I came into this very recently. I think the commission just should do a better job here in weighing these cases because this is this one, this particular wage loss is for life. And, again, the argument in two prong, the alternative argument is that he may be entitled to a wage loss. If he is, let's get it right and not just the first job that somebody goes and takes. You see, our ability to provide the rehabilitation, at least in some cases, I'm not prepared to argue that here necessarily. I'm looking at the bigger picture, and that is that once somebody has a job, it's a fait accompli. It's the three little pigs, you know, it's done. Well, okay, so really, you know, since we're always talking about the former workers' comp on Springfield, what's your reviewability of a wage loss differential under the Act? Well, the current Act, as you know, is five years. In five years, he could go back to being a union patron if he could do so. I'm not casting aspersions. This man was injured. He's a working person, as am I. And so I, you know, I don't want to look at the main thing. Well, aside from that fact, okay, you've got a five-year period of time. Five years to go back to doing that. Okay, five years. But within the five-year period of time, you can bring the reviewability, right, or not? There is. But, of course, as the Court knows, the ability to review wage loss is highly, highly limited. Right. I'm actually weighing on that myself. I think they should be reviewable when we find out someone's making, you know, as much money as they used to make. But that's an economic change. That's not permitted. I would like to see that, although I could see lots and lots of litigation. You know, the commission would be flooded. Well, this is an economic statute, so. Yeah. I mean, that's the whole purpose of it. So. It is, but there are, again, this would be legislatively handled. The concept of full performance of one's duties, the quantitative. Well, I know, but it does seem often that respondents' arguments are along that line and maybe best modified legislatively. The problem is we have to work within the four corners of the act. And that's the way the whole setup is created. No, I appreciate that, Your Honor. In fact, looking at some of the recent cases, Jackson Park, the Spriggan case, I see the Court looking at the shrewd only employment, the cable ordering, those concepts, which I think in the past the commission really hasn't looked that closely at. And so, I mean, just one lawyer's opinion, I mean, I have found that. So your argument is, under the facts of this case, those standards of capable or suitability have not been met. That's your conclusion? Yes, I think so. But, again, it's not an intangible resource. I think just the nature. You never said that. I'm talking about your analytic framework. Okay. Yes. Okay. But I think that's it. Can I ask one other question? Oh, sure. You indicated there's no question this man was injured. Is that correct? It's in our brief. Yeah. I'm about ready to ask you, are you abandoning the first two issues in your brief, number one, no accident, number two, no cause of connection? It appears to me that he was injured. All right. Okay. Thank you. So that's the issue. Very good. Thank you. You have time in reply. Counsel, you may respond and suggest you respond on the issue that's before us. Certainly, Your Honor. Yes. May it please the Court of Counsel, Joshua Rodolphe for Mr. Ronald Young. Again, I will only address the wage differential issue in this case. This is a case that is subject to the manifest witness evidence standard, despite it being framed as a matter of law in the opening brief in this case. There are two competing opinions, as Justice Hoffman touched on earlier, namely that of Ms. Carrie Stassa and that of Mr. Daniel Minnick, vocational counselors. The commission looked at the expert testimony, looked at the evidence in the record, and arrived at the conclusion that Ms. Stassa was more credible than Mr. Minnick. Her opinion carried more weight than Mr. Minnick's opinion. Why would they say why? Simply because if you look at Mr. Minnick's opinion, he's listing jobs that require GED, which the petitioner doesn't have, jobs in a supervisory role, which the petitioner doesn't have a history of in this situation. Ms. Stassa looks at not only the petitioner's age, physical capabilities, and work history. She opines, then, therefore, that he is capable of working in unskilled positions. Now, in this situation, it's very easy to determine what his wage loss is because he is working in suitable employment per Ms. Stassa. Now, he is a skilled worker, but you've knocked that idea out that he's incapable of returning to a job that has those skills. Correct. At one time he was a skilled worker. Okay. And that is the first problem, partial capacity that prevents him from pursuing his usual customary line of employment. In this situation, he was an industrial painter. There's a lot of different interchangeable terms that are thrown around in these briefs, industrial painter, commercial painter, union painter. Industrial painter, we're talking about somebody who's up on scaffolding, painting facades, painting the underside of a lakeshore drive. We're not talking about Bob Ross painting happy trees. We're talking about somebody who is working from heights, working in booms. He was injured. And probably not doing masking. Correct. Painting happy trees, is that what you said? Yes. What's a happy tree compared to a sad tree? I would have to ask Mr. Ross. Okay. I just wondered. You kind of took me aback on that. Okay. So he has a restriction. He has the FCE, which again, per Dr. Cole, is only a guiding point of what somebody's physical capabilities are. They imply that they can put in this other restriction of ladder usage. Now, Costis said in his argument that there's evidence in the record that he's using ladders for residential painting. There's nothing in the record showing he's using a ladder. In fact, there's nothing in here saying he could do what he was doing before. That's exactly the essence of this argument. He's incapable of going back to being an industrial painter. He attempted to perform residential painting, which again, is different. Anybody who's painted a room knows you're not hanging from a boom and you're not painting the underside of a lakeshore drive. He was unable to do it. He went back to work with Arabaldivia. He could not work there. He worked there for approximately four months. He could not do it because of the fumes. He was making $10 an hour. He then took the job where he's at now. He's working making $10 an hour in an unskilled job, which is precisely what the stats have said he is capable of doing. Those are his abilities. He has the ability to work in an unskilled job. Mr. Minnick said, well, you can make this, you can make this, you can make this. Mr. Minnick never met with the petitioner and found jobs that specifically required things the petitioner did not have. The commission weighed this evidence and made a decision. And again, it's expressed within the province to do this. They're asking you to re-weigh the evidence and find Mr. Minnick's opinion more credible. That's not the function of this court. That's the commission's function, and that's precisely what the commission did. There is ample evidence in this case that shows the commission was correct. Now, the appellant actually cites two cases, Patricek and Durfee. Durfee is easily distinguishable. Durfee was a gentleman who worked as a school administrator, got injured, didn't actually have a physical restriction placed upon him, was returned back to work on a trial basis, never returned to work. He took a different job. He took a job working as a clerical worker for a church making $250 a week. There was no job offer in this case. Patricek is easily distinguishable as well. He was working for the trucking company. He was working for the trucking business, had restrictions that made him couldn't go back to his job. His employer talked to him about returning to work for them in a position that was different than his previous one, but making comparable pay. He said, no, I'm okay. I'm good. And then he turned down two other potential offers from other trucking companies. The vocal opinion in that case said, based on his connections within the trucking company or trucking industry, he should be able to find comparable work and make incomparable pay. That's not this case. That's not this case at all. There were no job offers, and there's nothing in here to suggest that he can go back to work as an industrial painter. The decision of the commission should be affirmed in its entirety. Thank you. Counsel, I may have interrupted you when you walked up to the podium. Did you, for the record, give your name? Joshua Rudolph. Okay, thank you. Counsel, you may reply. Two points, Your Honor. Upon reflection, Justice Hoffman asked about our position on the calculation of the wage loss. I believe the underlying concept there was that the wage loss was not calculated correctly because the commission chose the lower paying job and not the higher. The second and more important point we'd like to make is that Mr. Young is a painter. There's, in terms of the dictionary of the titles, of occupational titles, there's not union painter and painter. There's just painter. And as Mr. Kelly testified, there's light, there's medium, there's heavy. There's different types of work out there. Also, the gentleman from the union was not able to specify what the union contract required as far as what the painters were required to lift and carry, et cetera. Petitioner's customary profession was painter. This particular job involved different types of things, as Mr. Kelly said. We had that issue as it related to nurses. And we determined that an operating room nurse is quite a different occupation than a nurse that merely works on the floor. And, therefore, the wage that we were comparing was that of an operating room nurse, not a nurse. And the same argument was made to us. A nurse is a nurse. We didn't buy it then. Why should we buy it now? Well, I appreciate completely what you're saying, but two things about his job. One, the job was eliminated. There was a layoff. But just conceding that there may be restrictions that prevent him from doing that, he was a painter. He, again, painter involves a lot of different things. A nurse is a professional. It's a profession. And generally speaking, you make a lot more as an operating room nurse than you do. You make a lot more as a union painter on the industrial side than you do paint houses. But I believe the union scale was $40.65. And I don't know that that was specifically for working at the pier. I think that's union painter generally. And, again, light, medium, heavy. So Jackson Park, there was a different spin on that because, of course, they put her back to work at a job that paid, generally paid less. That's not happening here. I understand Jackson Park, and I understand the rationale, and I understand your question perfectly. But, I mean, this is different because, as far as we're concerned, he could be a painter. He may not be able to do the kind of work he did at the pier, however. Thank you. Thank you, counsel, both for your arguments in this matter this morning. And with the statement of advisement, written disposition shall issue. The court will stand and recess subject to call. Have a good day. Thank you.